

JUDGE BUCHWALD

13 CIV 8175

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

WEST PALM BEACH POLICE PENSION
FUND, Individually and On Behalf Of All Others
Similarly Situated,

        Plaintiff,

vs.

BIOSCRIP, INC., RICHARD M. SMITH, HAI V.
TRAN, MARY JANE GRAVES, PATRICIA
BOGUSZ, MYRON Z. HOLUBIAK,
CHARLOTTE W. COLLINS, SAMUEL P.
FRIEDER, DAVID R. HUBERS, RICHARD L.
ROBBINS, STUART A. SAMUELS, GORDON
H. WOODWARD, KIMBERLEE SEAH,
JEFFRIES LLC, MORGAN STANLEY & CO.
LLC, SUNTRUST ROBINSON HUMPHREY,
INC., DOUGHERTY & COMPANY, and NOBLE
INTERNATIONAL INVESTMENTS, INC.

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO.

CLASS ACTION

RECEIVED
NOV 15 2013
U.S.D.C. S.D. N.Y.
CASHIERS

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff West Palm Beach Police Pension Fund ("Plaintiff") alleges upon personal knowledge as to allegations specifically pertaining to Plaintiff and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by BioScrip, Inc. ("BioScrip" or the "Company") and other related parties and non-parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles, shareholder communications, conference calls and postings on BioScrip's website concerning the Company's public statements; and (d) review of other publicly available information concerning BioScrip, the Individual Defendants, the Officer and Director Defendants, and the Underwriter Defendants (as defined below).

## I.    NATURE OF THE ACTION

1.    This is a federal securities class action brought against BioScrip and certain of its officers and/or directors, and the underwriters for violations of the federal securities laws. Plaintiff brings this action on behalf of all persons or entities that purchased or otherwise acquired BioScrip securities between August 8, 2011 and September 23, 2013, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").    The Exchange Act claims allege that certain defendants engaged in a fraudulent scheme to artificially inflate the Company's stock price.

2.    The action is also brought on behalf of all persons or entities who purchased shares of BioScrip's common stock pursuant and/or traceable to one of the Company's Secondary Public Offerings (collectively, the "Offerings"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act").    The first Secondary Public Offering commenced on or about April 18, 2013 for the sale of approximately 14.375 million shares (the "Apr. 2013

SPO"). The second Secondary Public Offering commenced on or about August 14, 2013 for the sale of approximately 6.9 million shares of common stock (the "Aug. 2013 SPO").

3.      Under the Securities Act, defendants are strictly liable for the material misstatements in the Offering Documents (as defined below) for these public stock offerings, and these claims specifically exclude any allegations of knowledge or scienter. The Securities Act claims also expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct.

4.      This Complaint alleges that in BioScrip's Offering Documents and throughout the Class Period, Defendants failed to disclose material adverse facts about the Company's financial well-being and future prospects. As a result of Defendants' wrongful acts, false and misleading statements and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and the other Class members have suffered significant losses and damages.

5.      BioScrip, a Delaware corporation headquartered in New York, purports to be a national provider of home infusion and other home healthcare services partnering with patients, physicians, hospitals, healthcare payors and pharmaceutical manufacturers to provide clinical management solutions and the delivery of cost-effective access to prescription medications and home healthcare services.

6.      On May 7, 2012, BioScrip and Walgreens announced in a press release that the Company had completed the sale of its "Community Pharmacies and Centralized Specialty and Mail Service Pharmacy" to Walgreens. The closing was effective on May 4, 2012 and the transaction represented a total deal value of $225 million, including approximately $161 million in cash and the retention by BioScrip of associated net working capital with a net value of approximately $64 million. The Company stated that it was going to use the proceeds from the

sale to focus on and expand its infusion pharmacy footprint to better serve its national customers, execute on strategic growth opportunities. And to pay down debt.

7.      On April 19, 2013, the Company issued a press release announcing its offering of 12.5 million shares of common stock at a price of $12.00 per share, with a 30-day option grant to the underwriters to purchase up to an additional 1,875,000 shares of the Company's common stock.  The Company was to realize net proceeds of approximately $106.5 million.   The Company completed its prospectus in connection with the Apr. 2013 SPO on that same day.

8.      On August 13, 2013, the Company issued a press release announcing the second SPO of 6,800,000 shares of common stock, with a 30-day option grant to the underwriters to purchase up to an additional 1,020,000 shares of the Company's common stock.  The Company filed its prospectus on that same day.

9.      On August 14, 2013, the Company issued a press release announcing the upsizing of the SPO from 6,800,000 to 6,895,873 shares, and the pricing of the second SPO.  The Company filed its completed Prospectus Supplement for the second SPO, which priced the shares at $13.65 per share on that same day.

10.      Then, on September 23, 2013, BioScrip disclosed in a Form 8-K filed with the SEC that the Company received a civil investigative demand issued by the United States Attorney's Office for the Southern District of New York, as well as a subpoena from the New York State Attorney General's Medicaid Fraud Control Unit, regarding the distribution of the Novartis Pharmaceuticals Corporation product, Exjade, by the Company's legacy specialty pharmacy division.

11.     The following day, the Company disappointed the investing public during an investor presentation by dramatically reducing its full year EBITDA forecast to approximately $56 million, as compared to analyst estimates of $70 million.

12.     On the news of a governmental investigation into the Company regarding Medicaid fraud, and the disappointing EBITDA guidance, BioScrip's share price plummeted 28% ($3.14 per share) over a 2-day trading period from $11.07 per share on Friday, September 20, 2013 to $8.47 per share on Tuesday, September 24, 2013.  This massive stock price decline eliminated over $210 million in the Company's market capitalization on unusually heaving trading volume.

13.     As further detailed below, throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about BioScrip's business and financial condition.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose to BioScrip investors that: (i) BioScrip improperly distributed the product Exjade through its specialty pharmacy operations, in violation of the False Claims Act and other federal and state statutes; (ii) a substantial portion of the Company's revenues were derived through the violation of federal and state laws and regulations relating thereto, and (iii) as a result, the Company's financial statements were deficient and misleading at all relevant times.

14.     As a result of Defendants' false and/or misleading statements, BioScrip shares traded at inflated prices during the Class Period.  Moreover, after disclosure of Defendant's false and/or misleading statements, BioScrip shares suffered a precipitous decline in market value, thereby causing significant losses and damages to Plaintiff and the other Class members.

II.     **JURISDICTION AND VENUE**

15.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78(i)(b), 78(t) and 78t-1(a), and pendent common law claims, and §§11 and 15 of the Securities Act, 15 U.S.C. §§77k and 77o.

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1307, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

17.     Venue is proper in this Judicial District pursuant to §22 of the Securities Act, and pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District. Additionally, many of the Underwriter Defendants maintain their executive offices and/or other offices within this Judicial District.  In connection with the acts and omissions alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

III.    **THE SECURITIES ACT CLAIMS**

A.     **PARTIES**

1.     **Plaintiff**

18.     Plaintiff West Palm Beach Police Pension Fund, as set forth in the accompanying certification, and incorporated by reference herein, purchased the publicly traded securities of BioScrip pursuant and/or traceable to the Company's April 18, 2013 secondary public offering at artificially inflated prices during the Class Period, and has been damaged thereby.

### 2.   **Securities Act Defendants**

#### (i)   *The Company*

19.     Defendant BioScrip is a company incorporated under the laws of Delaware, with its principal executive offices located at 100 Clearbrook Road, Elmsford, New York 10523.  The Company's common stock is traded on the NASDAQ under the ticker symbol "BIOS."

#### (ii)   *The Officer and Director Defendants*

20.     Defendant Richard M. Smith ("Smith") became the Company's President and Chief Operating Officer ("COO") in January 2009, and was appointed a director of the Company in September 2009.  On January 1, 2011, Smith became the Company's Chief Executive Officer ("CEO").  Defendant Smith signed the Company's Registration Statement in connection with its Apr. 2013 and Aug. 2013 SPO's.  Smith signed and certified the Company's Form 10-K for the fiscal year ended December 31, 2012.[1]  Defendant Smith certified the accuracy of the statements and the effectiveness of the Company's internal controls in the 2013 First Quarter Form 10-Q[2] and 2013 Second Quarter Form 10-Q[3].

21.     Defendant Hai V. Tran ("Tran") has been the Company's Senior Vice President, Chief Financial Officer ("CFO"), and Treasurer since May 14, 2012.  Defendant Tran signed the Company's Registration Statement in connection with its Apr. 2013 and Aug. 2013 SPO's.  Defendant Tran signed and certified the Company's Fiscal Year 2012 Form 10-K.  Defendant

---

[1] The Company's annual filing on Form 10-K filed with the SEC on March 15, 2013 for fiscal year ended December 31, 2012 ("Fiscal Year 2012 Form 10-K").

[2] The Company's quarterly filing on Form 10-Q filed with the SEC on May 9, 2013 for the period ending March 31, 2013 ("2013 First Quarter Form 10-Q").

[3] The Company's quarterly filing on Form 10-Q filed with the SEC on August 8, 2013 for the period ending June 30, 2013 ("2013 Second Quarter Form 10-Q").

Tran also certified the accuracy of the statements and the effectiveness of the Company's internal controls in the 2013 First Quarter and Second Quarter Form 10-Qs.

22.     Defendant Patricia Bogusz ("Bogusz") was, and at all relevant times, has been the Company's Vice President of Finance.  Defendant Bogusz signed the Company's Registration Statement in connection with its Apr. 2013 and Aug. 2013 SPO's.  Bogusz signed the Company's 2013 First Quarter and Second Quarter Form 10-Qs.

23.     Defendant Myron Z. Holubiak ("Holubiak") has been a director of the Company since March 2005, and was appointed Chairman of the Board on April 18, 2012.  Defendant Holubiak signed the Company's Registration Statement in connection with its Apr. 2013 and Aug. 2013 SPO's.  Holubiak also signed the Company's Fiscal Year 2012 Form 10-K.

24.     Defendant Charlotte W. Collins, Esq. ("Collins") has been a director of the Company since April 2003.  Defendant Collins signed the Company's Registration Statement in connection with its Apr. 2013 and Aug. 2013 SPO's.  Collins also signed the Company's Fiscal Year 2012 Form 10-K.

25.     Defendant Samuel P. Frieder ("Frieder") was appointed a director of the Company in connection with the Company's acquisition of CHS in March 2010.  Frieder is a Managing Partner of Kohlberg & Co., L.L.C. ("Kohlberg"), and a member of Kohlberg's Investment Committee.  Defendant Frieder signed the Company's Registration Statement in connection with its Apr. 2013 and Aug. 2013 SPO's.  Frieder also signed the Company's Fiscal Year 2012 Form 10-K.

26.     Defendant David R. Hubers ("Hubers") has been a director of the Company since March 2005.  Defendant Hubers signed the Company's Registration Statement in connection

with its Apr. 2013 and Aug. 2013 SPO's.  Hubers also signed the Company's Fiscal Year 2012 Form 10-K.

27.    Defendant Richard L. Robbins ("Robbins") has been a director of the Company since March 2005.  Defendant Robbins signed the Company's Registration Statement in connection with its Apr. 2013 and Aug. 2013 SPO's.  Robbins also signed the Company's Fiscal Year 2012 Form 10-K.

28.    Defendant Stuart A. Samuels ("Samuels") has been a director of the Company since March 2005.  Defendant Samuels signed the Company's Registration Statement in connection with its Apr. 2013 and Aug. 2013 SPO's.  Samuels also signed the Company's Fiscal Year 2012 Form 10-K.

29.    Defendant Gordon H. Woodward ("Woodward") was appointed a director of the Company in connection with the Company's acquisition of CHS in March 2010.  Woodward is a Partner and Chief Investment Officer of Kohlberg & Co, L.L.C. ("Kohlberg"), and a member of Kohlberg's Investment Committee.  Defendant Woodward signed the Company's Registration Statement in connection with its Apr. 2013 and Aug. 2013 SPO's.  Woodward also signed the Company's Fiscal Year 2012 Form 10-K.

30.    Defendant Kimberlee Seah ("Seah") was, and at all relevant times has been, the Company's Senior Vice President, Secretary and General Counsel.  Seah signed the Company's Registration Statement in connection with its Apr. 2013 and Aug. 2013 SPO's.

31.    Defendants Smith, Tran, Bogusz, Holubiak, Collins, Frieder, Hubers, Robbins, Samuels, Woodward, and Seah are collectively referred to herein as the "Officer and Director Defendants."  The Officer and Director Defendants served as BioScrip's officers and/or directors

during the Class Period, and are strictly liable under the Securities Act for endorsing the Company's false statements in the Offering Documents.

### (iii)    *The Underwriter Defendants*

32.    Defendant Jeffries LLC ("Jeffries") acted as a representative for the underwriters in BioScrip's Apr. 2013 SPO.  Jeffries is headquartered at 520 Madison Avenue, 10th Floor, New York, NY 10022.

33.    Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") acted as a representative for the underwriters in BioScrip's Apr. 2013 SPO and Aug. 2013 SPO's.  Morgan Stanley is headquartered in this District at 1585 Broadway, New York, NY 10036.

34.    Defendant SunTrust Robinson Humphrey, Inc. ("SunTrust") acted as an underwriter in BioScrip's Apr. 2013 SPO.  SunTrust is headquartered at 3333 Peachtree Rd NE, Atlanta, GA 30326.

35.    Defendant Dougherty & Company ("Dougherty") acted as an underwriter in BioScrip's Apr. 2013 SPO.  Dougherty is headquartered at 90 South Seventh Street, Suite 4300, Minneapolis, MN 55402.

36.    Defendant Noble International Investments, Inc.    ("Noble") acted as an underwriter in the Apr. 2013 SPO.  Noble is headquartered at 6501 Congress Avenue, Suite 100, Boca Raton, FL 33487.

37.    The Defendants listed above are sometimes referred to as the "Underwriter Defendants."    The Company, the Officer and Director Defendants, and the Underwriter Defendants are collectively referred to as the "Securities Act Defendants."

### B.    CLAIMS AGAINST THE SECURITIES ACT DEFENDANTS

38.    On March 18, 2013, the Company filed with the SEC its Form S-3 Registration Statement, which it subsequently amended on a Form S-3A, on April 4, 2013 (the "Apr. 2013 Registration Statement").

39.    On April 4, 2013, the Company also filed its prospectus in connection with the Apr. 2013 SPO.

40.    On April 16, 2013, the Company issued a press release announcing its public offering of shares of common stock.

41.    On April 19, 2013 the Company issued a press release announcing the pricing of its offering of 12.5 million shares of common stock at a price of $12.00 per share, with a 30-day option grant to the underwriters to purchase up to an additional 1,875,000 shares of the Company's common stock.  The Company was to realize net proceeds of approximately $106.5 million.

42.    On the same day, BioScrip completed its prospectus in connection with the Apr. 2013 SPO (the "Apr. 2013 Prospectus") pursuant to Rule 425(b)(5) and Rule 424(b)(7).  The Apr. 2013 Prospectus explicitly incorporated by reference the Fiscal Year 2012 Form 10-K, filed on March 15, 2013; the Company's current reports on Form 8-K, filed on February 4, 2013, March 14, 2013, April 5, 2013 and April 16, 2013; portions of the proxy statement for the Company's 2013 annual meeting of stockholders filed with the SEC on April 2, 2013; and the description of Bioscrip's common stock contained in the Company's amended registration statements on Form 8-A/A, filed on August 1, 1996, December 4, 2002, December 14, 2006, and March 4, 2009.

43.    The Apr. 2013 Prospectus, the Apr. 2013 Registration Statement and all amendments are collectively referred to as the "Apr. 2013 Offering Documents".

44.     On April 24, 2013, the Company issued a press release announcing the closing of the Apr. 2013 SPO in which it offered 14,375,000 shares of common stock, of which 1,875,000 shares were sold pursuant to the underwriters' option.  The Apr. 2013 SPO was conducted pursuant to an effective shelf registration statement.

45.     On August 13, 2013, the Company issued a press release announcing the second SPO of 6,800,000 shares of common stock, with a 30-day option grant to the underwriters to purchase up to an additional 1,020,000 shares of the Company's common stock.

46.     On the same day, BioScrip filed its prospectus supplement with the SEC in connection with the second SPO for the sale of the Company's 6,800,000 shares of common stock.  The Aug. 2013 SPO was conducted pursuant to an effective shelf registration statement.

47.     On August 14, 2013, the Company issued a press release announcing the upsizing of the second SPO from 6,800,000 to 6,895,873 shares, and the pricing of the second SPO.  On the same day, the Company filed its completed Prospectus Supplement to the Prospectus dated April 4, 2013, for the second SPO pursuant to Rule 425(b)(5) and Rule 424(b)(7) (the "Aug. 2013 Prospectus"), which priced the shares at $13.65 per share.

48.     The Aug. 2013 Prospectus Supplement explicitly incorporated by reference the Fiscal Year 2012 Form 10-K, which the Company filed with the SEC on March 15, 2013; the Company's quarterly reports on Form 10-Q filed with the SEC on May 9, 2013 and August 8, 2013; the Company's current reports on Form 8-K filed on February 4, 2013, March 14, 2013, April 5, 2013, April 16, 2013, April 22, 2013, May 8, 2013, May 13, 2013, June 3, 2013, June 17, 2013, June 18, 2013, July 9, 2013, July 19, 2013, August 1, 2013 and August 7, 2013; portions of the proxy statement for the Company's 2013 annual meeting of stockholders filed with the SEC on April 2, 2013; and the description of Bioscrip's common stock contained in the

Company's registration statements on Form 8-A/A, filed on August 1, 1996, December 4, 2002, December 14, 2006, and March 4, 2009.

49.     The Aug. 2013 Prospectus and all supplements and/or amendments are collectively referred to as the "Aug. 2013 Offering Documents".

50.     The Apr. 2013 Offering Documents and the Aug. 2013 Offering Documents are collectively referred to as the "Offering Documents."

51.     The Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing its preparation.  Additionally, by explicitly incorporating by reference several of the Company's filings with the SEC, which contained false and misleading financial results and statements, the Offering Documents contained untrue statements of material facts and/or omitted to state facts necessary to make the statements contained in the Offering Documents not misleading.

52.     In particular, the Fiscal 2012 Form 10-K, which was explicitly incorporated by reference in the Offering Documents, falsely stated the following:

Every state's laws require our pharmacy locations in those states be licensed as an in-state pharmacy to dispense pharmaceuticals. State controlled substance laws require registration and compliance with state pharmacy licensure, registration or permit standards promulgated by the state's pharmacy licensing authority. Pharmacy and controlled substances laws often address the qualification of an applicant's personnel, the adequacy of its prescription fulfillment and inventory control practices and the adequacy of its facilities. In general, pharmacy licenses are renewed annually. We believe our pharmacy locations materially comply with all state licensing laws applicable to these businesses. If our pharmacy locations become subject to additional licensure requirements, are unable to maintain their required licenses or if states place burdensome restrictions or limitations on pharmacies, our ability to operate in some states would be limited, which could have an adverse impact on our business. We believe the impact of any such requirements would be mitigated by our ability to shift business among our

numerous locations.

Many states, as well as the federal government, are considering imposing, or have already begun to impose, more stringent requirements on compounding pharmacies. (See also Food, Drug, and Cosmetic Act, below). We believe that our compounding is done in safe environments and we have clinically appropriate policies and procedures in place. We only compound pursuant to a patient specific prescription and do so in compliance with USP 797 standards. We cannot predict the impact of increased scrutiny on or regulation of compounding pharmacies.

Many of the states into which we deliver phanl1aceuticals have laws and regulations that require out-of-state phanl1acies to register with, or be licensed by, the boards of pharmacy or similar regulatory bodies in those states. These states generally permit the dispensing pharmacy to follow the laws of the state within which the dispensing pharmacy is located. However, various state pharmacy boards have enacted laws and/or adopted rules or regulations directed at restricting or prohibiting the operation of out-of-state pharmacies by, among other things, requiring compliance with all laws of the states into which the out-of-state pharmacy dispenses medications, whether or not those laws conflict with the laws of the state in which the pharmacy is located, or requiring the pharmacist-in-charge to be licensed in that state. ***To the extent that such laws or regulations are found to be applicable to our operations, we believe we comply with them.*** To the extent that any of the foregoing laws or regulations prohibit or restrict the operation of out-of-state pharmacies and are found to be applicable to us, they could have an adverse effect on our operations.

53.     The statements in the Offering Documents were materially false and misleading and failed to disclose that: (i) BioScrip improperly distributed the product Exjade through its specialty pharmacy operations, in violation of the False Claims Act and other federal and state statutes; (ii) a substantial portion of the Company's revenues were derived through the violation of federal and state laws and regulations; and (iii) as a result, the Company's financial statements were deficient and misleading at all relevant times.

## IV.    COUNTS AGAINST SECURITIES ACT DEFENDANTS RELATED TO THE OFFERINGS

### COUNT I
#### FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT
#### AGAINST THE SECURITIES ACT DEFENDANTS

54.    Plaintiff incorporates the allegations contained above pertaining to the false Offering Documents.  Plaintiff repeats and realleges Sections I, II, III, VIA., and XIII, as if fully set forth herein.  For purposes of Counts I and II, Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as these counts are based solely on claims of strict liability and/or negligence under the Securities Act.

55.    This Count is brought against the Securities Act Defendants on behalf of all persons or entities who purchased BioScrip stock issued pursuant or traceable to the April 18, 2013 SPO and/or the August 14, 2013 SPO.  The Offering Documents for these Offerings were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed adequately to disclose material facts, as described above.

56.    The Securities Act Defendants are strictly liable for the above-stated misstatements and omissions, and for the damages that Plaintiff and the other members of the Class have sustained thereby.  The Securities Act Defendants are responsible for the contents and dissemination of the Offering Documents, and did not conduct a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

57.    The Securities Act Defendants issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to the investing public that were contained in the Offering Documents, which misrepresented or failed to disclose, among other

14

things, the facts set forth above.  By reasons of the conduct herein alleged, each Section 11

Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

## COUNT II
### FOR VIOLATIONS OF SECTION 12(A)(2) OF THE SECURITIES ACT
### AGAINST DEFENDANT BIOSCRIP AND THE UNDERWRITER DEFENDANTS

58.     Plaintiff incorporates the allegations contained above pertaining to the false

Offering Documents.  Plaintiff repeats and realleges Sections I, II, III, VI.A., and XIII, as if fully

set forth herein.  For purposes of Counts I and II, Plaintiff expressly excludes and disclaims any

allegation that could be construed as alleging fraud or intentional or reckless misconduct, as

these counts are based solely on claims of strict liability and/or negligence under the Securities

Act.

59.     This Count is brought against the Underwriter Defendants and BioScrip on behalf

of all persons or entities who purchased BioScrip stock issued pursuant or traceable to the April

18, 2013 SPO and/or the August 14, 2013 SPO.  The Company and the Underwriter Defendants

were sellers, offerors, and/or solicitors of purchasers of the shares offered pursuant to the

Offering Documents.

60.     The Offering Documents contained untrue statements of material facts, omitted to

state other facts necessary to make the statements made not misleading, and concealed and failed

to disclose material facts.  The Company and the Underwriter Defendants' actions of solicitation

included participating in the preparation and dissemination of the false and misleading Offering

Documents.

61.     Defendant BioScrip and the Underwriter Defendants owed to the purchasers of

BioScrip's common stock, including Plaintiff and the other members of the Class, the duty to

make a reasonable and diligent investigation of the statements contained in the Offering

Documents to ensure that such statements were true, and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. BioScrip and the Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Offering Documents, as set forth above.

62.    Plaintiff and the other members of the Class purchased or otherwise acquired BioScrip's securities pursuant to and/or traceable to the defective Offering Documents. Plaintiff did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Offering Documents.

63.    Plaintiff, individually and representatively, hereby offers to tender to the BioScrip and the Underwriter Defendants that stock which Plaintiff and the other Class members continue to own, on behalf of all members of the Class who continue to own such stock, in return for the consideration paid for that stock, together with interest thereon. Class members who have sold their BioScrip stock are entitled to rescissory damages.

64.    By reason of the conduct alleged herein, these defendants violated and/or controlled a person who violated §12(a)(2) of the Securities Act. Accordingly, Plaintiff and the other members of the Class who hold BioScrip securities purchased in the SPO have the right to rescind and recover the consideration paid for their BioScrip securities, and hereby elect to rescind and tender their BioScrip securities to the BioScrip and the Underwriter Defendants sued herein. Plaintiff and the other Class members who have sold their BioScrip securities are entitled to rescissory damages.

65.    This action is brought within three years from the time that the securities upon which this Count is brought were sold to the public, and within one year from the time when

Plaintiff discovered or reasonably could have discovered the facts upon which this Count is based.

### COUNT III
#### FOR VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT
#### AGAINST THE OFFICER AND DIRECTOR DEFENDANTS

66.     Plaintiff incorporates the allegations contained above pertaining to the false Offering Documents.  Plaintiff repeats and realleges Sections I, II, III, VI.A., and XIII, as if fully set forth herein.  This Count is brought against the Officer and Director Defendants, each of whom was a controlling person of BioScrip by virtue of their position as directors and/or senior officers of BioScrip, and/or by virtue of their status as a major shareholder of the Company.

67.     This Claim is brought against the Officer and Director Defendants pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, on behalf of all persons or entities who purchased BioScrip stock issued pursuant or traceable to the April 18, 2013 SPO and/or the August 14, 2013 SPO.

68.     The Company is liable under Section 11 of the Securities Act, as set forth in Count I herein with respect to the SPO.

69.     Each of the Officer and Director Defendants was a control person of the Company with respect to the SPO by virtue of that individual's position as a senior executive officer and/or director of the Company.  These Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of BioScrip.  By reason of their positions within the Company, and/or their stock ownership, and/or because of their positions on BioScrip's Board of Directors, the Officer and Director Defendants had the requisite power to directly or indirectly control or influence the specific corporate policies that resulted in the unlawful acts and conduct alleged in Count I.

70.     Each of the Officer and Director Defendants was a culpable participant in the violations of Section 11 of the Securities Act alleged in Count I above, based on their having signed the Offering Documents, and having otherwise participated in the process that allowed the SPO to be successfully completed.  These Defendants, by virtue of their managerial and/or board positions with the Company, controlled the Company, as well as the contents of the Offering Documents at the time of the SPO.  Each of the Officer and Director Defendants was provided with or had unlimited access to copies of the Offering Documents, and had the ability to either prevent their issuance or cause them to be corrected.

71.     As a result, the Officer and Director Defendants are liable under Section 15 of the Securities Act for the Company's primary violation of Section 11 of the Securities Act.

72.     By virtue of the foregoing, Plaintiff and the other members of the Class who purchased or otherwise acquired the Company's common stock pursuant and/or traceable to the SPO are entitled to damages against the Individual Defendants.

## V.     CLAIMS UNDER THE EXCHANGE ACT

### A.     PARTIES

#### 1.     Plaintiff

73.     Plaintiff West Palm Beach Police Pension Fund, as set forth in the accompanying certification and incorporated by reference herein, purchased BioScrip stock during the Class Period, and was damaged thereby.

#### 2.     Defendants

##### (i)     *The Company*

74.     As described above, Defendant BioScrip is a company incorporated under the laws of Delaware, with its principal executive offices located in Elmsford, New York.

(ii)    *The Individual Defendants*

75.    Defendant Smith (as described above) was the Company's President, COO and CEO.  Defendant Smith signed and certified the Company's Form 10-Ks and certified the Company's Form 10-Qs filed with the SEC during the Class Period.

76.    Defendant Tran (as described above) was the Company's Senior Vice President, CFO and Treasurer.  Defendant Tran signed and certified the Company's Fiscal Year 2012 Form 10-K.  Defendant Tran also certified several of the Company's Form 10-Qs filed with the SEC during the Class Period.

77.    Defendant Bogusz (as described above) was the Company's Vice President of Finance.  Bogusz signed several of the Company's Form 10-Qs filed with the SEC during the Class Period.

78.    Defendant Holubiak (as described above) was a director and Chairman of the Board.  Holubiak signed the Company's Fiscal Year 2011 and 2012 Form 10-Ks filed with the SEC.

79.    Defendant Collins (as described above) was a director of the Company. Defendant Collins signed the Company's Fiscal Year 2011 and 2012 Form 10-Ks filed with the SEC.

80.    Defendant Frieder (as described above) was appointed a director of the Company in connection with the Company's acquisition of CHS in March 2010.  Frieder is a Managing Partner of Kohlberg and a member of Kohlberg's Investment Committee.  Defendant Frieder signed the Company's Fiscal Year 2011 and 2012 Form 10-Ks filed with the SEC.

81.     Defendant Hubers (as described above) was a director of the Company. Defendant Hubers signed the Company's Fiscal Year 2011 and 2012 Form 10-Ks filed with the SEC.

82.     Defendant Robbins (as described above) was a director of the Company. Defendant Robbins signed the Company's Fiscal Year 2011 and 2012 Form 10-Ks filed with the SEC.

83.     Defendant Samuels (as described above) was a director of the Company.  Samuels signed the Company's Fiscal Year 2011 and 2012 Form 10-Ks filed with the SEC.

84.     Defendant Woodward (as described above) was appointed a director of the Company in connection with the Company's acquisition of CHS in March 2010.  Woodward is a Partner and Chief Investment Officer of Kohlberg and a member of Kohlberg's Investment Committee.  Woodward signed the Company's Fiscal Year 2011 and 2012 Form 10-Ks filed with the SEC.

85.     Defendant Mary Jane Graves ("Graves") was the Company's Interim CFO and Treasurer between January 2011 and May 2012.  Defendant Graves signed and certified the Company's Fiscal Year 2011 Form 10-K filed with the SEC.  Graves also signed several of the Company's Form 10-Qs filed with the SEC during the Class Period.

86.     For purposes of Plaintiff's Exchange Act claims, Defendants Smith, Tran, Bogusz, Holubiak, Collins, Frieder, Hubers, Robbins, Samuels, Woodward, and Graves are referred to as the "Individual Defendants."

87.     BioScrip and the Individual Defendants are referred to as the "Exchange Act Defendants."  The Securities Act Defendants and the Exchange Act Defendants are collectively referred to as "Defendants."

88.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of BioScrip, were privy to confidential, proprietary and material adverse non-public information concerning BioScrip, its operations, finances, financial condition and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

89.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act, and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of BioScrip's business.

90.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts, and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and publicly disseminated documents alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

91.     As senior executive officers and/or directors, and as controlling persons of a publicly traded company whose securities were, and are, registered with the SEC pursuant to the Exchange Act, and were traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to BioScrip's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, as well as to correct any previously issued statements that had become materially misleading or untrue, so the market price of BioScrip's securities would be based on truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

92.     The Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of BioScrip's publicly traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts.

## VI.    SUBSTANTIVE ALLEGATIONS

### A.    BACKGROUND OF BIOSCRIP

93.     BioScrip is a national provider of specialty pharmacy and home health services that partner with patients, physicians, hospitals, healthcare payors and pharmaceutical manufacturers to provide clinical management solutions and delivery of cost-effective access to prescription medications and home health services.  The Company's services are purportedly designed to improve clinical outcomes with chronic and acute healthcare conditions while controlling overall healthcare costs.

94.    In 2005, Chronimed, Inc. and MIM Corporation merged into BioScrip, and the Company became a top provider in specialty pharmacy services, PBM, and mail order services.

95.    In 2010, BioScrip complemented its pharmacy business with the addition of home health services and home nursing products and equipment.

96.    In 2012, BioScrip entered a new phase to focus on the development of its home infusion business.

### B.    FALSE AND MISLEADING STATEMENTS

97.    The Class Period begins on August 8, 2011.  On that date, the Company issued a press release reporting its financial results for the second quarter ended June 30, 2011.  The Company reported revenue of $441.4 million, with a net loss of $2.3 million, or $0.04 per share, including $8.7 million in restructuring charges and a legal settlement.

98.    Defendant Smith stated the following in the August 8, 2011 press release:

> Overall, we are making positive steps forward in establishing ourselves as a recognized national provider of infusion and pharmacy services, and the initiatives we put in place with managed care payors over the last year are beginning to produce results. While there is still more work to be done, we are pleased to see progress as we look to the second half of the year.

99.    On August 9, 2011, the Company filed its quarterly report for the period ended June 30, 2011 on Form 10-Q with the SEC that was signed by Defendant Bogusz, and repeated the Company's previously announced quarterly financial results.  In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Smith and Graves, stating that the financial information contained in the Form 10-Q was accurate, fairly presented, in all material respects, the financial condition and results of operations of the Company, and disclosed all material changes in the Company's internal control over financial reporting.

100.    On November 8, 2011, the Company issued a press release reporting its financial results for the third quarter ended September 30, 2011.  The Company reported revenue of $454.0 million, with net income of $0.5 million, or $0.01 per diluted share, including $5 million in restructuring charges, severance and other employee costs.

101.    On November 9, 2011, BioScrip filed with the SEC its quarterly report for the period ended September 30, 2011 on Form 10-Q that was signed by Defendant Bogusz, and repeated the Company's previously announced quarterly financial results.  In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Smith and Graves, stating that the financial information contained in the Form 10-Q was accurate, fairly presented, in all material respects, the financial condition and results of operations of the Company, and disclosed all material changes in the Company's internal controls over financial reporting.

102.    On March 9, 2012, the Company issued a press release reporting its financial and operating results for fourth quarter and fiscal year ended December 31, 2011.  The Company reported revenue of $483.3 million, with net income of $6.7 million, or $0.12 per share, for the quarter, compared to a net loss of $67.1 million, or ($1.25) per share, and total revenue of $450.4 million for the same period a year ago.  For the year, the Company reported revenue of $1.8 billion, and net income of $7.9 million, or $0.14 per share, compared to revenue of $1.6 billion and a net loss of $69.1 million, or ($1.37) per share, for the same period a year ago.

103.    On March 14, 2012, the Company filed an annual report for the year ended December 31, 2011 on Form 10-K with the SEC, that was signed by Defendants Smith, Graves, Holubiak, Collins, Frieder, Hubers, Robbins, Samuels, Woodward, and repeated the Company's previously reported financial results.  In addition, the Form 10-K contained signed certifications pursuant to SOX by Defendants Smith and Graves, stating that the financial information

contained in the Form 10-K was accurate, fairly presented, in all material respects, the financial condition and results of operations of the Company, and disclosed all material changes in the Company's internal control over financial reporting.

104.    The Form 10-K stated the following, concerning regulation of the pharmacy industry:

> Every state's laws require our pharmacy locations in those states be licensed as an in-state pharmacy to dispense pharmaceuticals. State controlled substance laws require registration and compliance with state pharmacy licensure, registration or permit standards promulgated by the state's pharmacy licensing authority. Pharmacy and controlled substances laws often address the qualification of an applicant's personnel, the adequacy of its prescription fulfillment and inventory control practices and the adequacy of its facilities. In general, pharmacy licenses are renewed annually. Our management believes our pharmacy locations materially comply with all state licensing laws applicable to these businesses. If our pharmacy locations become subject to additional licensure requirements, are unable to maintain their required licenses or if states place burdensome restrictions or limitations on pharmacies, our ability to operate in some states would be limited, which could have an adverse impact on our business. We believe the impact of any such requirements would be mitigated by our ability to shift business among our numerous locations.

> Many of the states into which we deliver pharmaceuticals have laws and regulations that require out-of-state mail service pharmacies to register with, or be licensed by, the boards of pharmacy or similar regulatory bodies in those states. These states generally permit the dispensing pharmacy to follow the laws of the state within which the dispensing pharmacy is located. However, various state pharmacy boards have enacted laws and/or adopted rules or regulations directed at restricting or prohibiting the operation of out-of-state pharmacies by, among other things, requiring compliance with all laws of the states into which the out-of-state pharmacy dispenses medications, whether or not those laws conflict with the laws of the state in which the pharmacy is located, or requiring the pharmacist-in-charge to be licensed in that state. ***To the extent that such laws or regulations are found to be applicable to our operations, we believe we comply with them.*** To the extent that any of the foregoing laws or regulations prohibit or restrict the operation of mail service pharmacies and are found to be applicable to us, they could have an adverse effect on our prescription mail service operations.

* * *

> There are other statutes and regulations which may also affect our mail service operations. The U.S. Federal Trade Commission requires mail order sellers of goods generally to engage in truthful advertising, to stock a reasonable supply of the products to be sold, to fill mail orders within 30 days, and to provide clients with refunds when appropriate.

105.    On May 9, 2012, the Company issued a press release reporting its financial results for the first quarter ended March 31, 2012.  The Company reported revenue of $155.6 million, with net loss of $2.7 million, or ($0.05) per diluted share, compared to revenue of $l30.8 million with net income of $2.9 million, or $0.05 per diluted share, for the same period a year ago.

106.    On May 10, 2012, BioScrip filed with the SEC its quarterly report for the period ended March 31, 2012 on Form 10-Q with the SEC, that was signed by Defendant Bogusz, and repeated the Company's previously announced quarterly financial results.  In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Smith and Graves, stating that the financial information contained in the Form 10-Q was accurate, fairly presented, in all material respects, the financial condition and results of operations of the Company, and disclosed all material changes in the Company's internal control over financial reporting.

107.    On August 8, 2012, the Company issued a press release reporting its financial results for the second quarter ended June 30, 2012.  The Company reported revenue of $155.9 million, with net income of $71.8 million, or $1.29 per share, compared to revenue of $l31.6 million, with net loss of $2.3 million, or $0.04 per share, for the same period a year ago.

108.    On August 9, 2012, BioScrip filed with the SEC its quarterly report for the period ended June 30, 2012 on Form 10-Q, that was signed by Defendant Bogusz, and repeated the Company's previously announced quarterly financial results.  In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Smith and Tran, stating that the

financial information contained in the Form 10-Q was accurate, fairly presented, in all material respects, the financial condition and results of operations of the Company, and disclosed all material changes in the Company's internal control over financial reporting.

109.    On November 7, 2012, the Company issued a press release reporting its financial results for the third quarter ended September 30, 2012.  The Company reported revenue of $170.4 million, with a net loss of $11.5 million, or ($0.20) per diluted share, compared to revenue of $l33.8 million, with net income of $5.5 million, or $0.01 per diluted share, for the same period a year ago.

110.    On November 9, 2012, BioScrip filed with the SEC its quarterly report for the period ended June 30, 2012 on Form 10-Q, that was signed by Defendant Bogusz, and repeated the Company's previously announced quarterly financial results.  In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Smith and Tran, stating that the financial information contained in the Form 10-Q was accurate, fairly presented, in all material respects, the financial condition and results of operations of the Company, and disclosed all material changes in the Company's internal control over financial reporting.

111.    On March 11, 2013, the Company issued a press release reporting its financial and operating results for fourth quarter and fiscal year ended December 31, 2012.  The Company reported revenue of $180.7 million, with net income of $7.2 million, or $0.12 per share for the quarter, compared to net income of $6.7 million, or $0.12 per share, and total revenue of $158.3 million for the same period a year ago.  For the year, the Company reported revenue of $662.6 million, and net income of $64.7 million, or $1.15 per share, compared to revenue of $554.5 million and a net income of $7.9 million, or $0.14 per share, for the same period a year ago.

112.    On March 15, 2013, the Company filed an annual report for the year ended December 31, 2012 on Form 10-K with the SEC, that was signed by Defendants Smith, Tran, Holubiak, Collins, Frieder, Hubers, Robbins, Samuels, Woodward, and repeated the Company's previously reported financial results.  In addition, the Form 10-K contained signed certifications pursuant to SOX by Defendants Smith and Tran, stating that the financial information contained in the Form 10-K was accurate, fairly presented, in all material respects, the financial condition and results of operations of the Company, and disclosed all material changes in the Company's internal control over financial reporting.

113.    The Form 10-K stated the following, concerning the regulation of the pharmacy industry:

> Every state's laws require our pharmacy locations in those states be licensed as an in-state pharmacy to dispense pharmaceuticals. State controlled substance laws require registration and compliance with state pharmacy licensure, registration or permit standards promulgated by the state's pharmacy licensing authority. Pharmacy and controlled substances laws often address the qualification of an applicant's personnel, the adequacy of its prescription fulfillment and inventory control practices and the adequacy of its facilities. In general, pharmacy licenses are renewed annually. We believe our pharmacy locations materially comply with all state licensing laws applicable to these businesses. If our pharmacy locations become subject to additional licensure requirements, are unable to maintain their required licenses or if states place burdensome restrictions or limitations on pharmacies, our ability to operate in some states would be limited, which could have an adverse impact on our business. We believe the impact of any such requirements would be mitigated by our ability to shift business among our numerous locations.

> Many states, as well as the federal government, are considering imposing, or have already begun to impose, more stringent requirements on compounding pharmacies. (See also Food, Drug, and Cosmetic Act, below). We believe that our compounding is done in safe environments and we have clinically appropriate policies and procedures in place. We only compound pursuant to a patient specific prescription and do so in compliance with USP 797 standards. We cannot predict the impact of increased scrutiny on or regulation of compounding pharmacies.

Many of the states into which we deliver phanl1aceuticals have laws and regulations that require out-of-state phanl1acies to register with, or be licensed by, the boards of pharmacy or similar regulatory bodies in those states. These states generally permit the dispensing pharmacy to follow the laws of the state within which the dispensing pharmacy is located. However, various state pharmacy boards have enacted laws and/or adopted rules or regulations directed at restricting or prohibiting the operation of out-of-state pharmacies by, among other things, requiring compliance with all laws of the states into which the out-of-state pharmacy dispenses medications, whether or not those laws conflict with the laws of the state in which the pharmacy is located, or requiring the pharmacist-in-charge to be licensed in that state. ***To the extent that such laws or regulations are found to be applicable to our operations, we believe we comply with them.*** To the extent that any of the foregoing laws or regulations prohibit or restrict the operation of out-of-state pharmacies and are found to be applicable to us, they could have an adverse effect on our operations.

114.    On April 16, 2013, the Company issued a press release announcing its public offering of shares of common stock.

115.    Also, on April 19, 2013, the Company issued a press release announcing the pricing of its offering of 12.5 million shares of common stock at a price of $12.00 per share, with a 30-day option grant to the underwriters to purchase up to an additional 1,875,000 shares of the Company's common stock.  On the same day, Bioscrip completed the Apr. 2013 Prospectus in connection with the Apr. 2013 SPO pursuant to Rule 425(b)(5) and Rule 424(b)(7), which incorporated by reference the false and misleading statements in the Fiscal Year 2012 Form 10-K filed with the SEC on March 15, 2013.

116.    On May 8, 2013, the Company issued a press release reporting its financial results for the first quarter ended March 31, 2013.  The Company reported revenue of $199.1 million, with a net loss of $7.5 million, or ($0.13) per diluted share, compared to revenue of $155.6 million, with a net loss of $2.9 million, or ($0.04) per diluted share, for the same period a year ago.

117.    On May 9, 2013, BioScrip filed with the SEC its quarterly report for the period ended March 31, 2013 on Form 10-Q, that was signed by Defendant Bogusz, and repeated the Company's previously announced quarterly financial results.    In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Smith and Tran, stating that the financial information contained in the Form 10-Q was accurate, fairly presented, in all material respects, the financial condition and results of operations of the Company, and disclosed all material changes in the Company's internal control over financial reporting.

118.    On August 7, 2013, the Company issued a press release reporting its financial results for the second quarter ended June 30, 2013.    The Company reported revenue of $190.7 million, with net loss of $8.3 million, or ($0.13) per share, compared to revenue of $155.9 million, with net loss of $8.3 million, or ($0.07) per share, for the same period a year ago.

119.    On August 8, 2013, BioScrip filed with the SEC its quarterly report for the period ended June 30, 2013 on Form 10-Q, that was signed by Defendant Bogusz, and repeated the Company's previously announced quarterly financial results.    In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Smith and Tran, stating that the financial information contained in the Form 10-Q was accurate, fairly presented, in all material respects, the financial condition and results of operations of the Company, and disclosed all material changes in the Company's internal controls over financial reporting.

120.    On August 13, 2013, the Company issued a press release announcing the second SPO of 6,800,000 shares of common stock, with a 30-day option grant to the underwriters to purchase up to an additional 1,020,000 shares of the Company's common stock.    On the same day, BioScrip filed its prospectus supplement with the SEC in connection with the second SPO, for the sale of the Company's 6,800,000 shares.

121.    On August 14, 2013, the Company issued a press release announcing the upsizing the second SPO from 6,800,000 to 6,895,873 shares of common stock, and the pricing of the second SPO.  On the same day, the Company filed the completed Aug. 2013 Prospectus for the second SPO pursuant to Rule 425(b)(5) and Rule 424(b)(7), which priced the shares at $13.65 per share.  The Aug. 2013 Prospectus incorporated by reference the false and misleading statements in the Fiscal Year 2012 Form 10-K, which the Company filed with the SEC on March 22, 2013, and the Company's quarterly reports on Form 10-Q filed with the SEC on May 9, 2013 and August 8, 2013.

122.    The Company's aforementioned statements are materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them that: (i) BioScrip improperly distributed the product Exjade through its specialty pharmacy operations, in violation of the False Claims Act and other federal and state statutes; (ii) a substantial portion of the Company's revenues were derived through the violation of federal and state laws and regulations; and (iii) as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

C.    **The Truth Comes To Light**

123.    On September 23, 2013, the Company filed a Form 8-K with the SEC in which it disclosed that BioScrip received a civil investigative demand issued by the United States Attorney's Office for the Southern District of New York, and a subpoena from the New York State Attorney General's Medicaid Fraud Control Unit, regarding the distribution of the Novartis Pharmaceuticals Corporation product, Exjade, by the Company's legacy specialty pharmacy division.  The 8-K stated in pertinent part as follows:

> The Company sold its traditional and specialty pharmacy mail operations and community retail pharmacy stores on May 4, 2012. Pursuant to a civil investigative demand issued by the United States Attorney's Office for the Southern District of New York and a subpoena from the New York State Attorney General's Medicaid Fraud Control Unit, the Company has cooperated by producing documents and information regarding the distribution of the Novartis Pharmaceuticals Corporation product Exjade by the Company's legacy specialty pharmacy division that was divested.

> On September 11, 2013, the Company was advised by the government that it plans to engage in discussions with the Company regarding its investigation. The investigation is civil in nature. To the Company's knowledge, no proceedings have been initiated against it at this time. The Company cannot predict or determine the timing or outcome of this investigation or the impact it may have, if any, on the Company's financial condition, results of operations or cash flows.

124.    The following day, the Company disappointed shareholders, during an investor presentation, by dramatically reducing its full year EBITDA forecast to approximately $56 million, as compared to analyst estimates of $70 million.

125.    On the news of a government investigation into the Company regarding Medicaid fraud, and the disappointing EBITDA guidance, BioScrip's share price plummeted 28% ($3.14 per share) over a 2-day trading period from $11.07 per share on Friday, September 20, 2013 to $8.47 per share on Tuesday, September 24, 2013.  This massive stock price decline eliminated over $210 million in the Company's market capitalization on unusually heaving trading volume.

126.    As a result of Defendants' wrongful course of conduct, BioScrip shareholders have lost millions of dollars in their investment in the Company.  Defendants created a materially false and misleading perception in the market regarding BioScrip's purportedly strong financial and operational condition, as well as the Company's promising future prospects.

## VII.    THE EXCHANGE ACT DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL INFORMATION

127.    The statements described above, and in Defendants' class period filings with the SEC, were each materially false and misleading when made.  Throughout the Class Period, Defendants failed to disclose that (i) BioScrip improperly distributed the product Exjade through its specialty pharmacy operations, in violation of the False Claims Act and other federal and state statutes; and (ii) a substantial portion of the Company's revenues were derived through the violation of federal and state laws and regulations.

128.    As a result, BioScrip's reported financial results were materially false and misleading.

## VIII.    UNDISCLOSED ADVERSE INFORMATION

129.    The market for BioScrip's securities was an open, well-developed and efficient market at all relevant times.  As a result of the materially false and misleading statements and failures to disclose described herein, BioScrip's securities traded at artificially inflated prices during the Class Period.  Plaintiff and the other members of the Class purchased or otherwise acquired BioScrip's securities relying upon the integrity of the market price of BioScrip's securities and market information related to BioScrip, and have been damaged thereby.

130.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of BioScrip's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as

set forth herein, not false and misleading.  Such statements and omissions were materially false and misleading in that they failed to disclose material adverse non-public information and misrepresented the truth about the Company, its business and operations, as alleged herein.

131.    At all relevant times, the material misrepresentations and omissions particularized herein directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and the other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about BioScrip's business, prospects and operations.

132.    These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of BioScrip and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' false and misleading statements made during the Class Period resulted in Plaintiff and the other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## IX.    SCIENTER ALLEGATIONS

133.    As alleged herein, the Exchange Act Defendants acted with scienter in that the Exchange Act Defendants knew that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

134.    As set forth herein, the Exchange Act Defendants, by virtue of their receipt of information reflecting the true facts regarding BioScrip, their control over, receipt and/or

modification of BioScrip's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning BioScrip, participated in the fraudulent scheme alleged herein.

135.    The ongoing fraudulent scheme described herein could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

## X.    STATUTORY SAFE HARBOR

136.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  Furthermore, many of the statements pleaded herein were not identified as "forward-looking statements" when made, or indicated that actual results "could differ materially from those projected."   Nor were there any meaningful cautionary statements identifying important factors that could cause actual results to differ materially from the statements made therein.

137.    Defendants are liable for the forward-looking statements pleaded because, at the time each of those forward-looking statements was made, Defendants knew the forward-looking statement was false, and/or that the forward-looking statement was authorized and/or approved by an executive officer of BioScrip who knew that such statement was false when made.

## XI.    LOSS CAUSATION

138.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market, and a course of conduct that artificially inflated the prices of BioScrip's securities and operated as a fraud or deceit on Class Period purchasers of BioScrip's securities by failing to disclose to investors that the Company's financial results were materially misleading and misrepresented material information.  When Defendants' misrepresentations and fraudulent

conduct were disclosed and became apparent to the market, the prices of BioScrip's securities fell precipitously as the prior inflation came out of the Company's stock price.  As a result of their purchases of BioScrip's securities during the Class Period, Plaintiff and the other Class members suffered economic loss.

139.    By failing to disclose the true state of the Company's business prospects and growth strategy, investors were not aware of the true state of the Company's financial status. Therefore, Defendants presented a misleading picture of BioScrip's business and prospects. Thus, instead of truthfully disclosing during the Class Period the true state of the Company's business, Defendants caused BioScrip to conceal the truth.

140.    Defendants' false and misleading statements had the intended effect and caused BioScrip's common stock to trade at artificially inflated levels throughout the Class Period. However, as a direct result of the Company's problems coming to light, BioScrip's common stock price fell approximately 28% percent immediately following the announcement of the Company's true financial state.  This drop removed the inflation from the price of BioScrip's securities, causing real economic loss to investors who purchased the Company's securities during the Class Period.

141.    The decline in the price of BioScrip's common stock after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of BioScrip's common stock price decline negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate

the prices of BioScrip's securities, and the subsequent decline in the value of BioScrip's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## XII.  APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

142.    At all relevant times, the market for BioScrip stock was an efficient market for the following reasons, among others:

a.      BioScrip  securities met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient market;

b.      As a regulated issuer, BioScrip filed periodic public reports with the SEC and NASDAQ;

c.      BioScrip securities were followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and

d.      BioScrip regularly issued press releases which were carried by national newswires.  Each of these releases was publicly available and entered the public marketplace.

143.    As a result, the market for BioScrip securities promptly digested current information with respect to the Company from all publicly-available sources, and reflected such information in BioScrip's stock price.  Under these circumstances, all purchasers of BioScrip securities during the Class Period suffered similar injury through their purchase of stock at artificially inflated prices, and a presumption of reliance applies.

## XIII.    CLASS ACTION ALLEGATIONS

144.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased or otherwise acquired BioScrip securities during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of BioScrip, and the directors, officers and employees of the Company or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

145.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members of the Class located throughout the United States.  Throughout the Class Period, BioScrip securities were actively traded on the NASDAQ (an open and efficient market) under the symbol "BIOS".  As of August 3, 2013, the Company had approximately 44.1 million shares outstanding.  Record owners and the other members of the Class may be identified from records maintained by BioScrip and/or its transfer agents, and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

146.    Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

147.    Plaintiff will fairly and adequately protect the interests of the members of the Class, and have retained counsel competent and experienced in class and securities litigation.

148.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b.    whether Defendants participated in and pursued the common course of conduct complained of herein;

c.    whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period, including the Offering Documents, misrepresented material facts about the business, finances, financial condition and prospects of BioScrip;

d.    whether statements made by Defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of BioScrip;

e.    whether the market price of BioScrip common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f.    the extent to which the members of the Class have sustained damages and the proper measure of damages.

149.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

## XIV.  COUNTS AGAINST DEFENDANTS UNDER THE EXCHANGE ACT

### COUNT IV
### For Violations Of §10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against the Exchange Act Defendants

150.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.  This claim is asserted against the Exchange Act Defendants.

151.    During the Class Period, BioScrip and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of BioScrip common stock; and (iii) cause Plaintiff and the other members of the Class to purchase BioScrip stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, the Exchange Act Defendants, and each of them, took the actions set forth herein.

152.    These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for BioScrip securities in violation of §10(b) of the Exchange Act and Rule 10b-5.  The Exchange Act Defendants are sued as primary participants

in the wrongful and illegal conduct charged herein. The Individual Defendants are also sued herein as controlling persons of BioScrip, as alleged herein.

153.    In addition to the duties of full disclosure imposed on the Exchange Act Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.), and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

154.    BioScrip and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of BioScrip as specified herein. These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of BioScrip's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about BioScrip and its business, operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of

business which operated as a fraud and deceit upon the purchasers of BioScrip's securities during the Class Period.

155.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's operational and financial reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew, or recklessly disregarded, was materially false and misleading.

156.    These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing BioScrip's operating condition, business practices and future business prospects from the investing public, and supporting the artificially inflated price of its stock.  As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions

alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

157.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of BioScrip securities was artificially inflated during the Class Period.  In ignorance of the fact that the market price of BioScrip shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Exchange Act Defendants, upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by the Exchange Act Defendants, but not disclosed in public statements by these Defendants during the Class Period, Plaintiff and the other members of the Class acquired BioScrip securities during the Class Period at artificially inflated high prices and were damaged thereby.

158.    At the time of said misrepresentations and omissions, Plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of BioScrip, which were not disclosed by the Exchange Act Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired BioScrip securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

159.    By virtue of the foregoing, BioScrip and the Individual Defendants each violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

160.    As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT V
### For Violations of §20(a) of the Exchange Act
### Against the Individual Defendants

161.    Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.  This claim is asserted against the Individual Defendants.

162.    The Individual Defendants were and acted as controlling persons of BioScrip within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Each of the Individual Defendants was provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

163.    In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

164.    As set forth above, BioScrip and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XV.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment as follows:

a)      Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)      Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c)      Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d)      Awarding such other relief as this Court deems appropriate.

## XVI.    <u>JURY DEMAND</u>

Plaintiff demands a trial by jury.

Dated: November 15, 2013

**LAW OFFICES OF CURTIS V. TRINKO, LLP**

By:  s/ Curtis V. Trinko_____
Curtis V. Trinko (CT-1838)
Jennifer E. Traystman
C. William Margrabe
16 West 46th Street, 7th Floor
New York, NY 10036
Tel:  (212) 490-9550
Fax:  (212) 986-0158
Email:  Ctrinko@trinko.com

*Liaison Counsel for Plaintiffs*

**SAXENA WHITE P.A.**
Joseph E. White, III
jwhite@saxenawhite.com
Lester R. Hooker
lhooker@saxenawhite.com
2424 N. Federal Highway, Suite 257
Boca Raton, FL 33431
Tel: 561 394-3399
Fax: 561 394-3382

*Counsel for Plaintiffs*

## CERTIFICATION AND AUTHORIZATION OF LEAD PLAINTIFF

I, Jonathan Frost, on behalf of the West Palm Beach Police Pension Fund ("WPB Police"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.   I am authorized in my capacity as Chairman of the Board of Trustees of WPB Police to initiate litigation and to execute this Certification on behalf of WPB Police.

2.   WPB Police did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3.   WPB Police is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4.   WPB Police's transactions in BioScrip, Inc. common stock are set forth in the Schedule A attached hereto.

5.   WPB Police has sought to serve and was appointed as lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

    *None*

6.   WPB Police has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff, was not appointed lead plaintiff or the lead plaintiff decision is still pending:

    *In re Questcor Securities Litigation,* Case No. 12-cv-1623-DMG (C.D. Cal.)

7.   WPB Police will not accept any payment for serving as a representative party on behalf of the Class beyond WPB Police's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.
Executed this __13__ day of November 2013.

West Palm Beach Police Pension Fund

Jonathan Frost, Chairman

## SCHEDULE A
### West Palm Beach Police Pension Fund
### Transactions in BioScrip, Inc.

**Beg. Hold.**                    0

| Common Stock Purchases | | | | Common Stock Sales | | |
|---|---|---|---|---|---|---|
| **Date** | **Shares** | **Price** | | **Date** | **Shares** | **Price** |
| 04/19/13 | 3,857 | $12.96 | | *None* | | |
| *04/19/13* | *3,450* | *$12.00* | | | | |
| 05/06/13 | 234 | $14.10 | | ***Post Class Period Sales\**** | | |
| 05/14/13 | 156 | $13.78 | | 09/24/13 | 8,552 | $8.67 |
| 07/09/13 | 855 | $17.54 | | | | |
| 01/04/13 | 710 | $27.19 | | | | |

*Italics: Indicates direct participation in secondary offering*
\* Used higher of actual sale price versus average share price from end of CP through sale date